IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:22CR115 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW F. DODSON, | ) | TRIAL BRIEF OF THE UNITED STATES |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its counsel, Michelle M. Baeppler, First Assistant United States Attorney, and Brian S. Deckert and Jason White, Assistant United States Attorneys, respectfully submits the following trial brief.

I. **STATEMENT OF FACTS**

On or about July 23, 2021, the FBI received a phone call from Orange, Ohio Fire Department that stated that the Orange Police Department had arrested Andrew F. DODSON ("DODSON") the previous day for an alcohol related driving offense. During the arrest and impounding of the vehicle, officers discovered a large cache of explosive precursors to include approximately 10 pounds of Potassium Perchlorate, Potassium Nitrate, powdered sugar, batteries, Vaseline, and a black tactical bag with the words, "POLICE" on it, containing ear protection and safety glasses.

On or about July 23, 2021, FBI Agents interviewed DODSON at the Beachwood City Jail. Agents recorded the interview. DODSON confirmed that there was Vaseline, potassium nitrate, potassium perchlorate, powdered sugar in his vehicle at the time of his arrest. DODSON stated that he used these materials to make smoke bombs for the 4th of July. DODSON stated the

Vaseline and paraffin wax are mixed together, melted, and applied with a Sharpie marker to make an endcap for a smoke bomb. DODSON stated that he made a bunch of smoke bombs for the 4th of July and deployed them at his brother's house who lives in Tallmadge, Ohio. DODSON described lighting the smoke bombs in the presence of children and allowing children to run around them and play with them. DODSON stated that when he had deployed all of the smoke bombs that he had made for the 4th of July, he took the remaining powders, placed them on the ground, and lit it on fire for the kids, and that they really enjoyed it. DODSON stated that he still had the materials in his vehicle at the time of his arrest because he had not yet had time to return them to his parents' residence where he stores them. DODSON specifically denied ever manufacturing a destructive or explosive device.

An FBI Special Agent Bomb Technician reviewed the list of items and stated that while the chemicals found by the police could be used to make smoke bomb-like devices, the chemicals found are also used to make cap-sensitive improvised explosives like those colloquially known in the bomb community as "Poor-Man's C4."[1] The FBI Special Agent Bomb Technician stated that Vaseline would not normally be a component of an improvised smoke bomb but is more commonly a component of "Poor-Man's C4". Furthermore, on or about July 26, 2021, Agents served a subpoena on a chemical company regarding DODSON. On or about July 26, 2021, the chemical company responded that DODSON had purchased a total of 50 pounds of Potassium Perchlorate between April 2020 and June 2020. Specifically, on or about April 15, 2020, DODSON purchased 10 pounds of Potassium Perchlorate which was ordered and sent to his residence. On or about June 14, 2020, DODSON purchased 20 more

---

[1] Cap-sensitive is a term to indicate the sensitivity of a given explosive. Cap-sensitive means that the material will detonate when a blasting cap [improvised or manufactured] is introduced.

pounds of Potassium Perchlorate which was also ordered and delivered to his residence. An additional 30 pounds was shipped to DODSON at another address. The FBI Special Agent bomb technician stated that this chemical, Potassium Perchlorate, is primarily used for making explosives. The bomb technician did not know this large amount of the chemical to be regularly used in creating homemade smoke devices, however, technically could be used for that purpose. The FBI Special Agent bomb technician and a laboratory chemist both concurred that the chemicals and precursors found in the vehicle at the time of DODSON's arrest could be used to construct a destructive device without any additional materials.

The chemical company subpoena also showed that DODSON purchased the chemicals using two separate email addresses which included "88" in their addresses[2]. During booking, police discovered that DODSON had tattoos depicting Ted Kaczynski, also known as the "Unabomber", John Wayne Gacy, and a swastika that had been covered by a hand grenade.

On or about July 29, 2021, in response to a federal search warrant, Facebook provided the FBI records related to DODSON's account "Werdna Nosdod." The records reveal that on or about July 10, 2020, DODSON was peer-to-peer messaging with USER1. USER1 and DODSON discussed meeting up. USER1 discussed defending her house like the character Rambo. DODSON stated, "If you're Rambo, who am I though lol. People call me the Unabomber."

---

[2] Racially or ethnically motivated violent extremists driven by a belief in the superiority of the white race (RMVEs) commonly use the number '88' contained within their online monikers to pay homage to Adolf Hitler. '88' represents the phrase "Heil Hitler" because 'H' is the eighth letter of the alphabet. Since DODSON used '88' on both his Gmail email as well as Yahoo email address, and no other logical reason for these numbers were discovered in the investigation, it is possible DODSON is paying homage to Hitler. The FBI is charged with investigating RMVEs which includes those who are motivated to violence based on their belief in the superiority of the white race. Nationally, and historically, these RMVEs have been known to share bomb making materials online and construct explosive devices in furtherance of their ideological agenda. The use of explosives and improvised explosive devices are commonly used by these RMVEs.

DODSON then sent a photograph of his tattoo depicting the UNABOMBER. DODSON then discussed placings explosives at USER1's house, stating "I'll set up parimeter [sic] alarms, and have explosive [sic] on remote detonators. They're at .#1 BOOM they're at #9 BOOM hahs [sic]." DODSON then sent a picture of 157 fused devices that appeared to be similar in likeness and kind to improvised to explosive devices to USER1, followed by a photograph of a remote detonator and 12 radio antenna devices.

The 12 radio antenna devices were described in the photograph as, "Alpha Fire 12Q wireless firing system 8th version." DODSON then informed USER1 that he has improvised claymores that contain approximately 1,000 BBs per device.[3] The FBI believes BBs are commonly used as shrapnel in these types of improvised devices. DODSON then tried to sell USER1 soft body-armor emblazoned with the "Punisher" emblem and a flame thrower. DODSON then sent USER1 a photograph of an individual who the FBI recognized as his daughter holding the flamethrower. In the background is the "Punisher" soft armor, firearms, and what appear to be improvised grenades for a grenade launcher (40 mm style). The FBI also located a photograph from the Facebook records displaying a closer depiction of a bandolier containing the improvised grenades and a grenade launcher. Improvised grenades are destructive devices which cannot be manufactured without a license and must be registered. ATF conducted a search of the National Firearms Registration and Transfer Record and found no evidence of any registration of firearms or destructive devices by DODSON.

On August 4, 2021, agents interviewed VICTIM #1 who shares custody of her

---

[3] Claymores are directional anti-personnel mine which can be activated remotely or by tripwire. Claymores fire a pattern of metal balls into a designated area, similar to a shotgun, with the intention of causing death or serious bodily injury. The use of BBs in a destructive device would mimic the destructive capability of a claymore.

daughter with the defendant. She was shown photographs of a child holding a flame thrower (found through a search of the defendant's Facebook application pursuant to a federal search warrant), confirmed it was her daughter, and identified the background as the defendant's former apartment. She reported that she had observed the defendant make items described as firecrackers and smoke bombs. She told agents the defendant had tattoos of John Wayne Gacy and the Unabomber on his arm and had a swastika on his arm, which has since been partially concealed with a grenade tattoo. Sarah stated that when they first met in 2013, she would describe him as "very racist." He shaved his head, wore boots with laces and red suspenders. She was not aware of him getting into fights or hurting anyone. Sarah stated he had domestic violence issues when they were together and described him as "an alcoholic and unstable." She recalled in 2013 he poured powder into a container and detonated the explosive which left a big hole in the ground. She recalled a time, about a year earlier, when the defendant was at her house and had 15 or 16 guns in his trunk. He claimed to her to have the paperwork to sell the guns. She stated Akron police arrived when he was attempting to sell the guns and took a black bag full of guns.

On August 4, 2021, the FBI executed search warrants at DODSON's residence and storage locker. Agents discovered a "Punisher" tactical vest, a camouflage shotgun and magazine, a black flame thrower, seven gas masks with four canisters, a shirt with a swastika, magazines, a remote detonator with the remote, a box of pyrotechnic signal shells and fusing with safety igniters, and a bag of pyrotechnic fuses. Agents did not find any completed destructive devices. Based in part on VICTIM #1's statement, the government and DODSON entered into a plea agreement whereby he entered a plea of guilty to a violation of Title 18,

5

United States Code § 1001, Making False Statements to an Agency of the United States. An information was filed in case number 1:21CR717 and DODSON was allowed to remain in the community while on bond.  On February 10, 2022, an initial pre-sentence investigative report was filed by the United States Pretrial and Probation Department. The report contained VICTIM #1's statement as detailed above.

On February 15, 2022, VICTIM #1 contacted the government regarding threats that she received from DODSON on the messaging application TalkingParents. On February 15, 2022, the FBI conducted a recorded interview of VICTIM #1.  VICTIM #1 stated that she and DODSON have a child together, who is currently seven years old. VICTIM #1 and DODSON have equal custody of that child, however, DODSON chooses to only exercise visitation rights on weekends. Since VICTIM #1 and DODSON have a contentious relationship, the two use a court approved application to communicate about their child and custody matters. On February 15, 2022, DODSON began to threaten VICTIM #1 over the messaging application. The following exchange occurred between the two [verbatim without correction, censoring curse words]:

> DODSON: So i just got the final paperwork from the FBI. You said A LOT of bad s--t about me. Not just about blowing something up in a park. You f----d me. You f----d me. You f----d me.
>
> DODSON: And when eva get oilder, ill let her read all the zhit you said tovthe fbi about her father yrying to get him thrown in prison. And she will fu king hate you. Youre such a fusgusting piece of s--t.
>
> DODSON: Andby the way, the pilice never took a black bag full of 16 guns from me when i was ar your house 10 years ago. Piece of s--t

VICTIM 1: I did't lie about anything outside of what's already on file through police departments and anything they could have found on your phone easily. You can let her read that stuff, whatever I said was true and easily found. Outside of that, don't know what you're talking about.

VICTIM 1: I never said that?

VICTIM 1: They told me about the Akron police report about the guns being in a bag and asked if I knew about that and I told them I saw the police reports? But uh, yeah never said anything about 16 guns in a black bag by my old house ever.

DODSON: Youre a piece of s--t and i hope you f-----g die slowly, very soon. Wanna knowwhy im in trouble, becUse of you.

DODSON: Youre a damn Liar.

VICTIM 1: That's literally not what I said and I'll gladly confront the FBI agent that said I said that lol. I never said you had a black bag full of 16 guns that's ridiculous and a full blown lie.

DODSON: Its un their official report. Like the s--t you said was before e abojt the park you adamantly denied.

VICTIM 1: The only time guns and a black bag with guns was ever mentioned was when the Akron police report was brought up when you were at the drive thru place and the police report stating all of that: outside of that, nope.

DODSON: F--k. You.

DODSON: Snitch a-- little c--t

VICTIM 1: You said we were together and you blew something up 10 years ago

which I told you I didn't even know you that long ago so that was a lie.

VICTIM 1: Oki dokie.

DODSON: You are f-----g dead to me.

VICTIM 1: Good.

DODSON: Hopefully youll Be dead to everyone soon you f-----g snitch

DODSON: See you in court. C--t.

DODSON: Lying piece of s--t.

DODSON: Liar

DODSON: Liar

DODSON: Liar

DODSON: Youre why i got arrested. Youre why i lost my job. Because of your statements.

DODSON: Youre dead.

VICTIM 1: Be mad because you' re being held accountable for your own actions? I didn' t tell them anything they didn' t already know, hence why I was questioned specifically about those things. I won' t get in trouble for you, by lying to FBI agents. YOU are why you lost your job. Making bombs, selling guns, and much more … but yet I 'm the reason? Okayyyyyyy.

DODSON:  Liar. Liar. Liar. Youre dead to me you piece of s--t

----

The messages take place between at or about 12:01pm and at or about 12:14pm on

8

February 15, 2022. VICTIM #1 told the FBI that she believed the threats were real and that she and her family were in real danger. VICTIM #1 told the interviewing Agents that she and her kids could stay with family until the police could apprehend DODSON.

VICTIM #1 believed that DODSON would carry out the threats based upon her past relationship with him which was physically abusive. Specifically, on May 5, 2016, at 9:21 pm, Akron Police Department were called to DODSON's residence. Upon arrival, officers discovered a van parked in the driveway with two children inside and no adults. Officers heard someone yelling from behind the residence and a female crying. Officers went around the corner and observed VICTIM #1 on the ground and DODSON standing over her with a gun in his hand. VICTIM #1 stated that she came to the residence and DODSON had another woman in the house. The two argued and DODSON retrieved a firearm and dragged her to the back yard and proceeded to assault her by repeatedly kicking her while she laid on the ground. DODSON was charged with domestic violence and ultimately pled guilty to Disorderly Conduct in Akron Municipal Court, case number 16CRB4322. VICTIM #1 retracted her statement which led to the reduction in charges.

On August 8, 2016, at 9:13 pm, Akron Police officers drove past DODSON's residence and observed two vehicles parked in the road very close to each other. The police officers turned around and returned to find the two vehicles now parked in the driveway of DODSON's residence. Officers observed DODSON, who was shirtless, yelling into the minivan that was occupied by VICTIM #1. The officers shined their flashlights on DODSON, who then fled on foot. The police pointed a taser at DODSON who refused to follow their commands. The police were able to handcuff DODSON and found him to be intoxicated. VICTIM #1 reported that DODSON became intoxicated and became angry with her and rammed his vehicle into her

9

vehicle multiple times and then got out and was yelling at her through the window. Police observed damage to VICTIM #1's vehicle as well as damage to the front end of DODSON's vehicle. DODSON was charged with felonious assault and domestic violence and pled guilty to Disorderly Conduct in Akron Municipal Court, case number 16CRB7759. VICTIM #1 retracted her statement again which led to the reduction of charges.

## II.     CONTROLLING LAW

Count 1 of the Indictment charges Defendant with Obstructing Justice by Retaliating Against a Witness, Victim, or Informant. The relevant statute for this offense is Title 18, United States Code, Section 1513(b)(2), which prohibits:

> Knowingly threatening to cause bodily injury to another, with the intent to retaliate against any person for providing information to a law enforcement officer relating to the commission or possible commission of a federal offense.

To sustain its burden of proof for this crime, the United States must prove all of the following elements beyond a reasonable doubt:

1: The defendant knowingly engaged in;

2: Conduct which caused bodily injury to another person or threatened to do so;

3: With the intent to retaliate against any person for information given by any person to a law enforcement officer relating to the commission or possible commission of a federal offense.

The first element the government must prove beyond a reasonable doubt is that the defendant knowingly engaged in the conduct alleged in the indictment. An act is done knowingly if it is done voluntarily and purposely and not by accident or mistake. Modern Federal Jury Instructions 46-75.

The second element the government must prove beyond a reasonable doubt is that the defendant's conduct caused bodily injury to the victim or threatened to do so.  Bodily injury means a cut, abrasion, bruise, burn or disfigurement, physical pain, illness, or the impairment of the function of a bodily member, organ or mental facility. It includes any injury to the body no matter how temporary.

It is not necessary to prove that the victim was injured; it is sufficient if the defendant knowingly threatened to cause bodily injury to the victim. A threat is simply the expression of intention to do harm. A threat may be communicated by words as well as gestures. In order to find that the defendant threatened to cause the victim bodily harm, the jury need not find that he intended to carry out the threat.  Modern Federal Jury Instructions 46-76.

The third element the government must prove beyond a reasonable doubt is that the defendant acted with the intent to retaliate against the victim for information given relating to the commission of a federal offense to a law enforcement officer.  A law enforcement officer means an officer or employee of the federal government authorized to prevent, investigate, or prosecute offenses or serving as a probation officer. The jury can be instructed that a Special Agent of the Federal Bureau of Investigation is a law enforcement officer. In this regard, the government must also prove that the defendant knew that the victim was cooperating with a federal law enforcement officer.  In order to satisfy this element, it is not necessary for the government to prove that the defendant knew he was breaking any particular law.  Modern Federal Jury Instructions 46-77.

Count 2 of the Indictment charges Defendant with Interstate Communications.  The relevant statute for this offense is Title 18, United States Code, Section 875(c), which prohibits:

11

> [the transmission] in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another.

To sustain its burden of proof for this crime, the United States must prove all the following elements beyond a reasonable doubt:

> 1: That the defendant sent a message in interstate commerce;
>
> 2: a reasonable observer would view the message as a threat; and
>
> 3: the defendant intended the message as a threat.

*United States v. Doggart*, 2018 U.S. App. LEXIS 29245 (6th Cir.), citing *Elonis v. United States*, 135 S.Ct. 2001, 2011 (2015).

*Threat*

The first element the government must establish beyond a reasonable doubt is that the words communicated by the defendant were in fact a threat.

A threat is a serious statement expressing an intention to inflict bodily injury (or kill or kidnap) at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner. For a statement to be a threat, the statement must have been made under such circumstances that a reasonable person who heard or read the statement would understand it as a serious expression of an intent to inflict bodily injury (or murder or kidnap). In addition, the defendant must have made the statement intending it to be a threat, or with the knowledge that the statement would be viewed as a threat.

To determine whether the defendant made a threat, the jury should consider the circumstances under which the statement was made, including its context with respect to surrounding conversation, the language the defendant used, and the reaction of those who heard or read the statement.

12

It is not necessary that the government prove that the defendant intended to carry out the threat or that he had the present ability to carry out the threat. A threat may be conditional upon the defendant's ability to carry it out in the future. The defendant's statement may be a threat even if it was never communicated, nor intended to be communicated, to the target of the threat. Instruction 31-8, Modern Federal Jury Instructions-Criminal (2018).

*Transmission in Interstate Commerce*

The second element the government must prove beyond a reasonable doubt is that the threat was transmitted in interstate (or foreign) commerce.

To establish this element, the government must prove that the communication passed between two or more states as, for example, a telephone call between New York and New Jersey; or between the United States and a foreign country. If the government establishes beyond a reasonable doubt that the communication passed between two or more states, it is sufficient to establish this element even if the defendant and the victim were in the same state at the time. The government is not required to prove that the defendant knew that the threat would be transmitted across state lines. Instruction 31-9, Modern Federal Jury Instructions-Criminal (2018).

*Intent*

The third element the government must establish beyond a reasonable doubt is that the defendant transmitted the threat knowingly and intentionally.

To establish this element, the government must prove that the defendant knowingly and intentionally sent the threat to [the victim] and that this did not occur by accident, mistake, or negligence. To establish this element, the government must prove that the defendant intended the communication to be received by [the victim] as a threat. The government is not required to prove that the defendant intended to carry out the threat. Instruction 31-10, Modern Federal Jury Instructions-Criminal (2018).

### III.   ANTICIPATED EVIDENTIARY AND LEGAL ISSUES

**Title 18 U.S.C. § 875(c) does not contain a mental state element for the offense of Interstate Communications.**

Title 18 U.S.C. § 875(c) prohibits any person from transmitting in interstate commerce any communication containing a threat to kidnap or injure the person of another. The statute, however, does not contain a mental state relative to any of these elements. In *Elonis v. United*

13

*States*, 135 S.Ct. 2001 (2015), the United States Supreme Court reviewed the statute in order to determine the appropriate mens rea for the offense. The Supreme Court states that "the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id.* at 2012. Negligence is not enough, however, the Supreme Court declined to decide whether recklessness would be sufficient. *Id.* at 2013.

In this case, the Government will establish the mental state of the Defendant that he had the purpose to issue a threat and that he knew that they would be viewed as a threat based upon the exhibits of the posts themselves which contain explicit threats of death as well as the victim's expression of fear and knowledge of Defendant's history of violence.

IV. **TRIAL DOCUMENTS**

    A. **STIPULATIONS**

The United States and Defendant have entered into a stipulation regarding the communications having been transmitted in interstate commerce.

    B. **PROPOSED JURY INSTRUCTIONS**

The United States respectfully requests that this Court charge the jury using the instructions submitted to the Court on July 20, 2022.

    C. **PROPOSED *VOIR DIRE* QUESTIONS**

The United States respectfully requests that this Court direct the proposed *voir dire* questions submitted to the Court on July 20, 2022 to the jury panel during *voir dire* examination.

    D. **PRELIMINARY STATEMENT**

The United States respectfully requests that this Court utilize the following preliminary statement:

The Indictment in this case accuses Defendant of Obstructing Justice by Retaliating Against a Witness, Victim, or Informant and Interstate Communications, on or about February 15, 2022. The United States alleges that on February 15, 2022, Defendant sent messages in interstate commerce threatening bodily injury to Sarah McNamara, in retaliation for providing information to a law enforcement officer during an investigation of possible federal offenses.

The Defendant denies the allegations.

E. EXHIBIT AND WITNESS LISTS

A witness list will be submitted in accordance with the Court's Trial Order. The United States will also exchange its proposed Exhibit List with Defendant. The United States has marked all proposed exhibits before trial in accordance with the Court's Trial Order. The United States will provide any updated exhibit and witness list prior to start of trial.

V. WITNESSES

A. *JENCKS* MATERIAL

The United States has already produced considerable *Jencks* material and will provide any remaining *Jencks* material to Defendant in a timely manner.

B. SEQUESTRATION OF WITNESSES AND PRESENCE OF GOVERNMENT AGENT AT TRIAL

The United States respectfully requests that this Court issue a witness-sequestration order pursuant to Federal Rule of Evidence 615. The United States designates Pete Mauro, the lead case agent, as its representative in this case to be present at counsel table throughout the trial. Agent Pete Mauro's presence in the courtroom during trial is essential to the presentation of the government's case. *See* FED. R. EVID. 615(b) (specifically excluding from a sequestration order

"an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney"); FED. R. EVID. 615(c) (providing an additional exception for essential witnesses).

## VI. ESTIMATED LENGTH OF TRIAL

The United States anticipates completing its case-in-chief in approximately 2 days.

## VII. CONCLUSION

The United States is prepared to submit additional briefing on any issue should this Court or circumstances require.

Respectfully submitted,

MICHELLE M. BAEPPLER
First Assistant United States Attorney

By: /s/ Brian S. Deckert
Brian S. Deckert (OH: 0071220)
Jason White (NY: 4672267)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3873